**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TAHER BASMA, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>          v.<br><br>GENEDX HOLDINGS CORP., KATHERINE STUELAND, AND KEVIN FEELEY,<br><br>          Defendants. | Case No. 3:26-cv-00880<br><br>PROPOSED CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Taher Basma, ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of (a) regulatory filings made by GeneDx Holdings Corp. ("WGS" or the "Company"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning WGS; and (d) other public information regarding the Company.

## INTRODUCTION

1.     This securities class action is brought on behalf of all persons or entities that purchased shares of WGS common stock between April 16, 2025 and May 4, 2026, inclusive (the "Class Period").

2.     The claims asserted herein are alleged against WGS and certain of the Company's senior executives, and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder (hereinafter referred to as the "Exchange Act claims").

3.     WGS is a genomics company that provides genetic testing services for diagnosing pediatric and rare diseases.

4.     On April 16, 2025, WGS announced an agreement to acquire Fabric Genomics ("Fabric"), an Oakland, California-based firm focused on AI-driven genomic interpretation in a deal worth up to $51 million. Under the terms of that deal, WGS would pay up to $33 million in cash up front, with a total consideration of up to $51 million, including payments linked to milestones. The acquisition was completed on May 5, 2025.

5.      At the time of the announcement of the Fabric acquisition, WGS stated in its press release that the acquisition would expand GeneDx's addressable market with multiple scalable revenue streams. Additionally, the Company stated that "Fabric Genomics' software transforms static data into a dynamic, recurring revenue-generating platform—driving growth through software margins and high-leverage interpretation services across geographies and clinical use cases."

6.      When the Company announced that the Fabric acquisition had been completed, WGS CEO Katherine Stueland ("Stueland") repeated the Company's prior statement that the acquisition would "unlock[ ] recurring software-based revenue streams through Fabric's interpretation as-a-service model."

7.      According to the Company's last Annual Report on Form 10-K, which was filed on February 23, 2026, WGS completed the acquisition of Fabric for total consideration of $36.5 million, which included $3.4 million in contingent consideration. The Company also noted a net increase of $0.6 million in goodwill.

8.      However, after hours on May 4, 2026, the Company reported its financial earnings results for the first quarter of fiscal year 2026, and revealed that the Company had missed its revenue estimates for both its exome and genome lines, and lowered its guidance for full year revenue to $475 – $490 million, down from $540 – $550 million.

9.      The day before the earnings results were released, WGS stock closed at $67.93 per share. As a result of this disclosure, the price of WGS stock declined by $33.42 or 49.20%.

10.     It was also revealed that the Company had written off $31.2 million, as an impairment loss directly attributable to Fabric.

11.    While the Company's main segments continued to grow in 2025, taking the Company's stock price to a high of $167.52 during the Class Period, Fabric failed to meet its goals of "driving growth" and instead has dragged the Company's financials down. Moreover, as Canaccord Genuity analyst Kyle Mikson wrote in a report issued after the Company's May 4, 2026 disclosures: "GeneDx's 1Q26 results appeared to reflect the reversal of important growth drivers (e.g., ASP expansion, non-core business). … We believe it is *alarming* that the problems appears more systemic in nature, as it is unclear when the company's core (whole exome sequencing and whole genome sequencing) business will recover to historical growth rates." (Emphasis added.)

12.    As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of WGS stock, Plaintiff and other Class members have suffered significant losses and damages.

13.    The claims against Defendants arise from their misrepresentations and omissions regarding the Company's statements regarding the impact of Fabric on the overall business of the Company. Throughout the Class period, WGS repeatedly made statements that would have caused the average investor to believe that the Fabric acquisition would improve the Company's financials and create efficiencies between it and the Company's core business. These statements include such statements such as: "There is room to run in terms of reducing COGS in the future by combining the best of capability between GeneDx and Fabric as we lean into the best possible algorithms to optimize dry lab processes." These and similar statements made throughout the Class Period were false. In truth, Defendants knew of, or recklessly disregarded, significant problems in Fabric's viability that would negatively impact WGS's overall business and operations. As a result, the Company's statements concerning its business, operations, and prospects lacked a reasonable

factual basis, and shares of WGS common stock traded at artificially inflated prices during the Class Period.

## JURISDICTION AND VENUE

14.     The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) as certain of the events or omissions giving rise to the claim arose in this District, including the dissemination of the statements alleged to be materially false and misleading into this District, and Defendant WGS transacts significant business in this District and its principal offices are located at 333 Ludlow Street North Tower, 6th Floor, Stamford, CT 06902 and are located within this District.

17.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiff

18.     Plaintiff Taher Basma, as set forth in the accompanying certification filed herewith as Exhibit 1, purchased WGS securities at inflated prices during the Class Period and suffered

damages as a result of the federal securities law violations and false and misleading statements and/or material omissions alleged herein.

**Defendants**

19.     Defendant WGS is a holding company and specializes in genomic diagnostics. The Company's principal offices are located at 333 Ludlow Street North Tower, 6th Floor, Stamford, CT 06902. WGS common stock trades on the National Association of Securities Dealers Automated Quotations Exchange ("NASDAQ") under the ticker symbol "WGS."  As of May 20, 2026, WGS had over 29.69 million shares of common stock outstanding, owned by hundreds or thousands of investors.

20.     Defendant Katherine Stueland ("Stueland") is, and was at all relevant times, CEO of WGS.

21.     Defendant Kevin Feeley ("Feeley") is, and was at all relevant times, CFO of WGS.

22.     Defendants Stueland and Feeley are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with WGS, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

**BACKGROUND**

23.     GeneDx, which trades on the NASDAQ exchange under the ticker WGS, is an American biotechnology company specializing in genomic diagnostics, with a focus on whole genome sequencing and whole exome sequencing for the diagnosis of rare and inherited disorders.

24.     On April 16, 2025, WGS announced an agreement to acquire Fabric Genomics, an Oakland, California-based firm focused on AI-driven genomic interpretation in a deal worth up to $51 million. Under the terms of that deal, WGS would pay up to $33 million in cash up front, with a total consideration of up to $51 million, including payments linked to milestones. The acquisition was completed on May 5, 2025.

25.     According to the Company's last Annual Report filed on February 23, 2026, WGS completed the acquisition of Fabric for total consideration of $36.5 million, which included $3.4 million in contingent consideration. The Company also noted a net increase of $0.6 million in goodwill.

26.     From FY 2023 to FY 2025, the Company's reported gross margins had continually increased. For FY 2023 gross margins were reported at 45%, for FY 2024 gross margins were reported at 65%, and for FY 2025 gross margins continued to grow to a reported 71%.

27.     On January 12, 2026, the Company announced its preliminary 2025 financial results and provided 2026 guidance in a press release. The Company expected full year 2026 guidance expecting revenues between $540 and $555 million.

**ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO SECTION 10(B) AND 20(A) OF THE EXCHANGE ACT OF 1934**

28.     The Class Period begins on April 16, 2025, when WGS announced the acquisition of Fabric. At the time of the announcement of the Fabric acquisition, WGS stated in its press release that the acquisition would expand GeneDx's addressable market with multiple scalable

revenue streams. Additionally, the Company stated that "Fabric Genomics' software transforms static data into a dynamic, recurring revenue-generating platform—driving growth through software margins and high-leverage interpretation services across geographies and clinical use cases."

29.     When the Company announced that the Fabric acquisition had been completed, CEO Stueland repeated the Company's prior statement that the acquisition would "unlock[ ] recurring software-based revenue streams through Fabric's interpretation as-a-service model."

30.     During the Q2 2025 Earnings Call on July 29, 2025, CEO Stueland in her opening remarks stated with regards to Fabric that "[o]ur lead will only continue to expand as we integrate Fabric Genomics and its proprietary algorithms into the core platform, further strengthening our competitive edge and positioning us for unprecedented scale."

31.     During that same call, CFO Feeley stated that "there was room to run in terms of reducing COGS in the future by combining the best of capability between GeneDx and Fabric as we lean into the best possible algorithms to optimize dry lab processes."

32.     Later during the Q+A portion of the Q2 2025 Earnings Call, CEO Stueland stated with regards to the acquisition:

> Fabric, we're really happy that we acquired it. So just out of the gate it's a fantastic team. . . So we're excited about it. They're on track with our plan this year in terms of their revenues, their gross margins. The teams have had a fantastic time collaborating and really starting to work together. So we're excited about it. And again, as we think about the potential for where Fabric can really help us drive the business, we've begun hiring sales reps for the international opportunity. So we're excited about the potential to start driving utilization of Fabric via GeneDx in international markets. It's also a really important asset as we think about how to solve newborn screening and ensure that patients have standardized results, whether a baby is born in London or in Los Angeles. So we're really excited about the future potential within the capabilities of GeneDx. So it's off to a great start.

33.     During the Company's Q3 2025 Earnings Call, **on October 28, 2025,** CFO Feeley discussed how the Company's adjusted gross margin had grown to 74%, which was driven by a favorable mix shift. Additionally, later during that call he mentioned that the average reimbursement rate was over $3,800, and that potentially the rate could bounce down in the magnitude of about $100.

34.     During an industry call on **January 14, 2026**, CEO Stueland discussed how Fabric would help WGS continue to scale:

> So I want to take a bit about -- to talk about how we intend to enable precision medicine to scale. And part of this includes having a global footprint. We acquired Fabric Genomics last year, which allows us to be able to take our interpretation platform, pour-in Infinity, our database, and then wherever there is a sequencer being bought anywhere in the world, we can put that interpretation platform and that centralized intelligence on top of it to be able to help patients back from where we are here in the U.S.

> And so we're going to continue to drive scale. We're going to continue to harness more and more patients and more diverse patients from around the world to continue to infuse Infinity, influence the way that these conditions are diagnosed, and ultimately get to a place where we are screening every baby at birth.

35.     During that same call, CEO Stueland reiterated the Company's financial projections, with the Company guiding to $540 million to $555 million in revenue, with growth in revenue and volume of 33% to 35%, and adjusted gross margins of at least 70%.

36.     During the Company's Q4 2025 Earnings Call on February 23, 2026, CFO Feeley discussed the quarter's financial results, and reported growth in revenue and in volume. However, his statements discussing mix dynamics now contrasted his statements from the prior quarter. Previously during the Q3 2025 Earnings Call, CFO Feeley noted that the Company's adjusted gross margin had grown to 74% driven by favorable mix shift. However, during the Q4 2025 Earnings Call, CFO Feeley noted that mix dynamics had fluctuated some in the fourth quarter, and

that CFO Feeley further noted that the average reimbursement rate for the quarter was approximately $3,750, Nevertheless, he stated that "the long-term trend is up and durable."

37.    Later during that call, CFO Feeley reiterated the Company's financial prospects and stated that:

> We're confident in our plan to deliver. We're expecting adjusted gross margin at approximately 70%, which takes mix shift dynamics into consideration. Despite a heavy investment cycle, we expect adjusted net income positive for the full year and each individual quarter. The first quarter of 2026, in particular, will be close to breakeven as we deliberately prioritize market capture over near-term margin optimization.

38.    During the Q+A portion of the Q4 2025 Earnings Call, CFO Feeley, in response to a question about gross margins, stated that the Company was well-equipped to optimize genome cost, reimbursement, and "invariably, genome COGS will be coming down as -- I mean, we'd expect them to as the utilization ramp increases" and "What we've taken is a fairly conservative view to gross margin in terms of the guide."

39.    The statements set forth above in ¶¶27-38 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, Defendants knew of, or recklessly disregarded issues with Fabric and misled investors regarding the actual quality of the acquisition. As a result, the statements concerning its business, operations, and prospects, lacked a reasonable factual basis.

## THE TRUTH EMERGES

40.    The truth emerged after hours on May 4, 2026, when the Company disclosed that the Fabric acquisition had not been as fruitful as had been initially planned and that the negative

impact of the Fabric acquisition had carried over adversely to the Company's overall business and operations.

41.    During the Q1 2026 Earnings Call, CEO Stueland admitted that it had become increasingly clear that Fabric was best suited only for international markets, that the Company had much left to do in order to fully integrate Fabric into GeneDx, and that the Company was lowering its expectations for revenue contribution in 2026. It was later revealed during this call that the Company had taken an impairment charge for Fabric, and that it had written down $31.3 million in goodwill and other Fabric intangible assets.

42.    CEO Stueland also announced on the May 4, 2026 call that the Company's projected earnings would be lower than expected, and reduced the Company's gross margins to at least 70%, down from more than 70% as previously stated.

43.    During the same call, CFO Feeley announced that the blended ARR was less than previously disclosed and "came in approximately $200 below expectations." He blamed the drop as a result of product mix shifts within the exome and genome portfolio, and also blamed an increase in Genome COGS. The Company's blended average reimbursement rate was approximately $3,300, down from $3,800 only two quarters before.

44.    Further, in the Company's press release, Form 10-Q and on the earnings call, it was reported that the Company had experienced a drop in its adjusted gross margin, which went from 74% to 69%, and that it was reducing its projected earnings from $540-$555 million to $475-490 million, a 15% decline.  It was also revealed that the Company had written off $31.2 million, as an impairment loss directly attributable to Fabric.

45.     The day before the 1Q26 results and lowered guidance were released, WGS stock closed at $67.93 per share. As a result of the disclosures, the price of WGS stock declined by $33.42 or 49.20%.

## LOSS CAUSATION

46.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

47.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of WGS common stock and operated as a fraud or deceit on the Class (defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of WGS common stock declined significantly. As a result of their purchases of WGS common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased WGS common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of WGS and their families and affiliates.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of May 20, 2026, WGS had over 29.69 million shares of common stock outstanding, owned by thousands of investors.

50. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a) Whether Defendants violated the Exchange Act;

b) Whether Defendants misrepresented and/or omitted material facts;

c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d) Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

e) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

f) Whether Defendants' conduct impacted the price of WGS common stock;

g) Whether Defendants' conduct caused the members of the Class to sustain damages; and

h) The extent of damages sustained by Class members and the appropriate measure of damages.

51. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

52. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

53.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

54.    To the extent that any of the alleged false statements described in this Complaint were forward-looking, WGS' "Safe Harbor" warnings accompanying any purportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

55.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of WGS who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

56.    At all relevant times, the market for WGS common stock was an efficient market for the following reasons, among others:

a) WGS common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) As a regulated issuer, WGS filed periodic public reports with the SEC and the NASDAQ;

c) WGS regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) WGS was followed by securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

57. As a result of the foregoing, the market for WGS common stock promptly digested current information regarding WGS from all publicly available sources and reflected such information in the price of WGS common stock. Under these circumstances, all purchasers of WGS common stock during the Class Period suffered similar injury through their purchase of WGS common stock at artificially inflated prices and the presumption of reliance applies.

58. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding WGS' business and operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

Given the importance of compliance with government regulations and billing practices, that requirement is satisfied here.

## CLAIMS FOR RELIEF

59.     The claims set forth below, pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, sound in fraud and are based on knowing or reckless misconduct by WGS and the Individual Defendants (collectively, the "Section 10(b) Defendants"). These claims are independent of any other claims asserted in this Complaint and the allegations of fraud pertaining to these claims under Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted herein.

## COUNT I

### For violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against WGS and the Individual Defendants

60.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

61.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase WGS common stock at artificially inflated prices.

62.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of WGS common stock in an effort to maintain

artificially high market prices for WGS common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

63.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

64.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal WGS' true condition from the investing public and to support the artificially inflated prices of WGS common stock.

66.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for WGS common stock. Plaintiff and the Class would not have purchased WGS common stock at the prices they paid, or at all, had they been aware that the market prices for WGS common stock had been artificially inflated by Defendants' fraudulent course of conduct.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of WGS common stock during the Class Period.

68.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

69.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of WGS within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-today operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about WGS, the Individual Defendants had the power and ability to control the actions of WGS and its employees. By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

a.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Date: June 4, 2026

/s/ Jessica M. Casey
Jessica M. Casey (CT-31749)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
156 S. Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
jcasey@scott-scott.com

*Local Counsel for Plaintiff Taher Basma*

Jeffrey W. Golan (*pro hac vice* forthcoming)
Chad A. Carder (*pro hac vice* forthcoming)
Andrew J. Heo (*pro hac vice* forthcoming)
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 963-0600
jgolan@barrack.com
ccarder@barrack.com
aheo@barrack.com

Michael A. Toomey (*pro hac vice* forthcoming)
**BARRACK, RODOS & BACINE**
11 Times Square
640 Eighth Avenue, 10th Floor
New York, NY 10036
Tel: (212) 688-0782

mtoomey@barrack.com

*Counsel for Plaintiff Taher Basma*